IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DAVID PLAYER,

    Petitioner,               No. CIV S-09-0849 MCE GGH P

    vs.

WARDEN HEDPHETH, et al.,

    Respondents.          FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2007 conviction for assault with a deadly weapon on a correctional officer while serving a life sentence (Cal. Penal Code § 4500) and possession of a sharp instrument while confined in a penal institution (Cal. Penal Code § 4502(a)). Pursuant to the Three Strikes law, petitioner was sentenced to 32 years to life imprisonment.

        The petition raises one claim: the trial court erred in refusing to admit evidence regarding the victim's propensity for violence. After carefully reviewing the record, the court recommends that the petition be denied.

/////

1

II.  AEDPA

The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this petition for habeas corpus which was filed after the AEDPA became effective. Neelley v. Nagle, 138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059 (1997). The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law. Id. at 1519. "Contrary to" clearly established law applies to two situations: (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000). It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions. While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue.  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

III. Discussion

    A.  Factual Background

Petitioner was convicted of assaulting Officer Tuter with an inmate made weapon at California State Prison-Sacramento on May 8, 2002.  In defense, petitioner testified that Officer Tuter attacked him.

Officer Mitchell testified in support of Officer Tuter's version of events for the prosecution.  Officer Mitchell testified that on May 8, 2002, petitioner came into the dining room and asked if he could work for her.  RT at 146.  Officer Mitchell told him "no" because it was his

1  day off. RT at 146. Officer Mitchell told petitioner that he needed to go back to his block
2  because the yard was getting ready to go in. RT at 147. Officer Mitchell testified that petitioner
3  went to the seven-control first and asked the officer if he could leave. RT at 147. The officer
4  told petitioner to ask the eight-control officer to let him out because he could not do it as he was
5  getting ready to bring the yard in. RT at 147. Petitioner then asked the eight control officer,
6  Officer Kaiser, to let him out so he could go to his block. RT at 148. Officer Kaiser told
7  petitioner that he would not let him out. RT at 148. Officer Mitchell asked Officer Kaiser to
8  "please let him out" so he could go to his block. RT at 148. Officer Kaiser told petitioner no
9  again. RT at 149. Petitioner and Officer Kaiser then began yelling at each other. RT at 149.

10         Officer Mitchell testified that at this point, Officer Tuter came out of his office.
11  RT at 150. Officer Tuter then asked petitioner to put on handcuffs. RT at 150. Officer Tuter let
12  petitioner back into the dining room to put on the handcuffs. RT at 150. As Officer Tuter went
13  to put the handcuffs on, petitioner jerked away. RT at 150. Officer Tuter then attempted to grab
14  petitioner, who then began swinging at Officer Tuter. RT at 151. Officer Mitchell attempted to
15  intervene, but was pushed back. RT at 151. She then sounded a personal alarm. RT at 151.
16  Officer Mitchell testified that she did not see Officer Tuter put his hands on petitioner's throat.
17  RT at 153.

18         Officer Tuter testified that on May 8, 2002, at approximately 2:50 p.m. he was in
19  his office doing paperwork. RT at 180. He heard a commotion in the rotunda area, so walked
20  out to see what was going on. RT at 181. He saw petitioner yelling at Officer Kaiser. RT at
21  181. Officer Tuter told petitioner to quiet down. RT at 181. Petitioner responded, "fuck you,"
22  and walked into the dining room. RT at 181. Officer Tuter then turned and walked back into the
23  dining room. RT at 182. Officer Tuter told petitioner that he was going to place him in
24  handcuffs. RT at 182. Officer Tuter then grabbed petitioner's arms and turned him toward the
25  table in the dining room. RT at 182. When Officer Tuter released petitioner's right hand so that
26  he could retrieve the handcuffs, petitioner turned to his left and hit Officer Tuter in the side of the

4

head. RT at 183. As petitioner continued to hit him, Officer Tuter realized that he was stabbing him. RT at 183. Officer Tuter received six to seven stab wounds in his head and one puncture wound through the top of his left shoulder. RT at 184. Eventually, several other officers arrived at the scene and helped Officer Tuter to restrain petitioner. RT at 185.

Officer Kaiser testified in support of Officer Tuter's version of events. Officer Kaiser testified that after petitioner began yelling at him, Officer Tuter came into the dining room and tried to get petitioner to submit to handcuffs. RT at 203. Officer Kaiser testified that when Officer Tuter placed his hands on petitioner's right hand, petitioner turned around and started swinging at Officer Tuter. RT at 203. Officer Kaiser then hit the alarm. RT at 204. Officer Kaiser testified that he did not see Officer Tuter place his hands on petitioner's throat. RT at 207.

Officer Fallon testified that he responded to the alarm. RT at 212. When he arrived, he saw petitioner and Officer Tuter "chest to chest." RT at 213. He saw petitioner's right hand come out and hit Officer Tuter in the back of his neck. RT at 214. He later saw a weapon in petitioner's hand. RT at 214. He then tried to pull petitioner away from Officer Tuter. RT at 215.

Wayne Irey, who worked as an investigator for the Sacramento County Sheriff's Department, testified that he was at California State Prison-Sacramento on May 8, 2002. RT at 273. He was in the vicinity of the holding cell where petitioner was being held following the incident. RT at 273. He heard petitioner say to him that Officer Kaiser had been harassing him for a long time. RT at274. Mr. Irey then told petitioner that was not who he had assaulted. RT at 274. Petitioner then responded, "well, he's been harassing me, too." RT at 274.

A urine sample taken from petitioner immediately after the incident revealed a blood alcohol level of .12. RT at 308. Pruno, i.e. inmate manufactured alcohol, was found in petitioner's cell after the incident. RT at 281.

\\\\\

Officer Cuellar testified that when she was employed at Salinas Valley State Prison in August 2002 she went to pick up mail from petitioner, who was housed there at the time. RT at 311-312. Petitioner said to her, "Did you like what you seen earlier?" RT at 313. Officer Cueller replied, "What?" RT at 313. Petitioner responded, "What? I'll stab you in the neck, bitch. I did it once. I'll do it again. That's what I'm here for." RT at 313.

Petitioner testified in his own defense. Petitioner admitted that he drank a couple cups of pruno on the day of the incident. RT at 354. Petitioner testified that Officer Tuter had been his employment supervisor for six months before the incident. RT at 362. During that time, petitioner had uncomfortable situations with Officer Tuter. RT at 362. Petitioner testified that Officer Tuter changed petitioner's pay number so that he had to perform an undesirable kitchen job. RT at 364. Petitioner confronted Officer Tuter about the change. RT at 364. Officer Tuter told him he changed the number "cuz I don't like you, and just cuz I can." RT at 365. Officer Tuter told petitioner that if he had a problem with it, he could find another job, and made a motion with his finger across his throat. RT at 365.

Petitioner testified that on another occasion, Officer Tuter was unhappy about something he did on the job and told him, "you fucking lie to me, I have my boot so far up your ass you're going to be spitting out black shit for months to come." RT at 367.

In contrast, Officer Tuter had testified that while petitioner was one of his worker's, he had no opinion of him. RT at 187. The only incident Officer Tuter had with petitioner prior to the May 2002 incident involved petitioner not reporting to work as ordered. RT at 180. Officer Tuter did not otherwise have a prior negative history with petitioner. RT at 180. Officer Tuter did not recall any of the previous incidents petitioner testified to. RT at 187-189.

Petitioner testified that just prior to the incident, Officer Mitchell told him to go back to his block. RT at 376. When petitioner tried to go out the 7 block, the tower officer told him he could not leave that way. RT at 376-377. Officer Mitchell told petitioner to try and leave

1  through 8 block. RT at 377. Officer Kaiser, who was at the 8 block door, told petitioner that he
2  could not go through. RT at 378. Petitioner then cussed him out. RT at 378.

3        After a minute, Officer Tuter arrived and told petitioner not to talk to Officer
4  Kaiser in that manner. RT at 379. He asked petitioner, "you want me to walk you to the fucken
5  cage?" RT at 379. Petitioner said, "You ain't fittin to walk me nowhere." RT at 379. Petitioner
6  then walked into the kitchen. RT at 379. When petitioner got into the kitchen, Officer Tuter
7  grabbed him from behind. RT at 380. Officer Tuter spun petitioner around and grabbed
8  petitioner's neck and throat. RT at 380. Petitioner could not breath. RT at 381. Petitioner
9  reached under a table and found an inmate weapon and tried to defend himself. RT at 382-383.

10       In rebuttal, Nurse Cunningham testified that she examined petitioner after the
11 incident and prepared a report documenting his injuries. RT at 425. The report states that
12 petitioner told her that the reason he was there was that "police f'ed me up and took me to the
13 cage." RT at 426. Petitioner did not complain of any injury to his neck. RT at 426. Her report
14 did not indicate any injury to petitioner's neck. RT at 427.

15       B. <u>Analysis</u>

16       Petitioner argues that the trial court erred in refusing to admit testimony regarding
17 Officer Tuter's alleged prior misconduct. The California Court of Appeal denied this claim for
18 the following reasons:

19       While serving two consecutive life terms in prison, defendant engaged in an altercation with several correctional officers. During the altercation, Officer Aaron
20       Tuter attempted to restrain defendant, who then used a sharpened toothbrush to stab Officer Tuter seven or eight times.
21

22       Defendant was subsequently charged with assault with a deadly weapon with malice aforethought while he was serving a life term (Pen.Code, § 4500-count
23       one),FN1 assault with a deadly weapon (§ 245, subd. (a)(1)-count two), and possession of a sharp instrument by a prison inmate (§ 4502, subd. (a)-count
24       three). The second amended information alleged two prior strike convictions pursuant to sections 1192.7, subdivision (c), and 667, subdivisions (b)-(i), and a prior conviction pursuant to section 667, subdivision (a).
25

26       FN1. Undesignated statutory references are to the Penal Code.

7

Prior to trial, defendant filed a motion seeking to admit evidence, in the form of witness testimony, that Officer Tuter previously "dry fired" a gun into a trash can near the cash register at a local restaurant. The restaurant manager asked Officer Tuter to leave, and the witness, a waitress, called the police. Officer Tuter was not charged with any crime.

In support of his motion to admit the waitress's testimony, defendant argued that Officer Tuter's conduct amounted to brandishing a firearm in violation of section 417, subdivision (a)(2), which the trial court agreed was a crime of moral turpitude. Thus, defendant wanted to use the waitress's testimony to impeach Officer Tuter's credibility.

After considering defendant's argument and offer of proof, the trial court denied his request to admit the evidence for impeachment purposes. The court found Officer Tuter's conduct to be "stupid and unprofessional," but concluded that it did not amount to brandishing a firearm, and thus was not an act of moral turpitude. The court further ruled that even if defendant's conduct was an act of moral turpitude, the prejudicial effect of the evidence "substantially outweigh[ed]" any probative value, and the testimony was excluded on that ground as well.

At trial, counsel offered that defendant would claim he stabbed Officer Tuter in self-defense. In support of his claim, defendant tried again to admit the waitress's testimony in order to corroborate his belief that Officer Tuter was trying to kill him. The court again denied defendant's request, saying: "Your initial motion was a motion to impeach the witness under Wheeler.[FN2] I denied that motion and stated my reasons for the record. That ruling will stand. [¶] I have not yet heard anything that would cause the court to change its previous ruling, but I will continue to listen to the trial, and if I believe that my initial ruling was incorrect or that that evidence is admissible under some other theory, then I will revisit it."

FN2. People v. Wheeler (1992) 4 Cal.4th 284.

At the close of evidence, defendant tried a third time to persuade the court to admit evidence of Officer Tuter's prior conduct. This time, defendant argued the evidence was admissible not only to impeach Officer Tuter and to corroborate defendant's state of mind, but also to show Officer Tuter's "character for violence or misconduct" under Evidence Code section 1103.

The court again rejected defendant's request: "I do not find that the offer of proof made on the incident satisfies the court that it is relevant. I do not find that it goes to the witness's character for violence. As the court understands the incident, I think it is dissimilar, and under Evidence Code section 352, that the probative value does not outweigh the prejudicial effect. Under Evidence Code section 352, I do not find that it is relevant to the charges in this case. [¶] And I will affirm my previous ruling."

Ultimately, the jury found defendant guilty of all charges and found true the special allegations and enhancements. The trial court denied defendant's request to strike either of his prior strike convictions, struck count two as a lesser included offense of count one, and stayed defendant's sentence on count three pursuant to

8

section 654. The court then sentenced defendant to 27 years to life on count one, added five years for defendant's prior conviction, and imposed $5,000 in restitution fines pursuant to sections 1202.4, subdivision (b) and 1202.45.

Defendant appeals his conviction.

DISCUSSION

On appeal, defendant claims the trial court erred in refusing to admit the waitress's testimony. Defendant fails, however, to articulate an argument for how the trial court erred-failing even to include the standard of review.

In a challenge to a judgment, it is incumbent upon the defendant to present factual analysis and legal authority on each point made or else the argument may be deemed waived. ( People v. Gurule (2002) 28 Cal.4th 557, 618 [appellate court may reject any claim where presentation of a generalized argument is raised without any argument or authority on the specific theory raised].) Here, rather than making a coherent claim on appeal, defendant recites an unnecessarily detailed description of the facts, describes the arguments made in the trial court, and includes only boilerplate law regarding due process and a defendant's right to put forth evidence. Defendant's argument leaves this court to discern his particular claim of error, find the applicable law, and perform the analysis. That is not the role of this court.

Nevertheless, having reviewed the record, we understand defendant's claim to be that the trial court abused its discretion when it thrice denied his request to admit evidence of Officer Tuter's prior conduct under Evidence Code section 352.

A trial court's exercise of discretion under Evidence Code section 352 will not be disturbed except on a showing the court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. ( People v. Rodriguez (1999) 20 Cal.4th 1, 9-10 ( Rodriguez ).)

Here, defendant presented the trial court with three separate grounds for admitting the waitress's testimony: (1) to impeach Officer Tuter, (2) to corroborate defendant's state of mind, and (3) to show Officer Tuter's character for violence. The court denied each request, finding that under Evidence Code section 352, the prejudicial effect of the evidence outweighed its probative value. Under the circumstances, we cannot say that the court's decision was "arbitrary, capricious, or patently absurd." ( Rodriguez, supra, 20 Cal.4th at pp. 9-10.) Accordingly, we find no error.

DISPOSITION

The judgment is affirmed.

Respondent's Lodged Document 4, pp. 1-6.

A writ of habeas corpus is available under 28 U.S.C. § 2254(a) only on the basis of some transgression of federal law binding on the state courts. Middleton v. Cupp, 768 F.2d

9

1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983). It is unavailable for alleged error in the interpretation or application of state law. Middleton v. Cupp, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986). Habeas corpus cannot be utilized to try state issues de novo. Milton v. Wainwright, 407 U.S. 371, 377, 92 S. Ct. 2174, 2178 (1972).

The Supreme Court has reiterated the standards of review for a federal habeas court. Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475 (1991). In Estelle v. McGuire, the Supreme Court reversed the decision of the Court of Appeals for the Ninth Circuit, which had granted federal habeas relief. The Court held that the Ninth Circuit erred in concluding that the evidence was incorrectly admitted under state law since, "it is not the province of a federal habeas court to reexamine state court determinations on state law questions." Id. at 67-68, 112 S. Ct. at 480. The Court re-emphasized that "federal habeas corpus relief does not lie for error in state law." Id. at 67, 112 S. Ct. at 480, citing Lewis v. Jeffers, 497 U.S. 764, 110 S. Ct. 3092, 3102 (1990), and Pulley v. Harris, 465 U.S. 37, 41, 104 S. Ct. 871, 874-75 (1984) (federal courts may not grant habeas relief where the sole ground presented involves a perceived error of state law, unless said error is so egregious as to amount to a violation of the Due Process or Equal Protection clauses of the Fourteenth Amendment).

The Supreme Court further noted that the standard of review for a federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States (citations omitted)." Id. at 68, 112 S. Ct. at 480. The Court also stated that in order for error in the state trial proceedings to reach the level of a due process violation, the error had to be one involving "fundamental fairness," Id. at 73, 112 S. Ct. at 482, and that "we 'have defined the category of infractions that violate "fundamental fairness" very narrowly.'" Id. at 73, 112 S. Ct. at 482. Habeas review does not lie in a claim that the state court erroneously allowed or excluded particular evidence according to state evidentiary rules. Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).

Under California law, "in a prosecution for a homicide or an assaultive crime where self defense is raised, evidence of the violent character of the victim is admissible to show that the victim was the aggressor." People v. Shoemaker, 135 Cal.App.3d 442, 446, 185 Cal.Rptr. 370 (1982). Evidence of specific instances of conduct, opinion, or reputation may be introduced for this purpose. (Evid.Code, § 1103, subd. (a)(1).) However, a court exercises discretion to determine whether the probative value of the evidence outweighs any prejudice. Id.

This state law issue is not cognizable under federal law. Whether or not a patently and largely prejudicial error in failing to permit violent character testimony could possibly be determined "fundamental," the error alleged here, if error at all,[1] is so far from fundamental that it falls before the usual rule of being not cognizable. Moreover, even if considered error which was reviewable, because the evidence against petitioner was strong, it is very unlikely that the outcome of the trial would have been different had the evidence been admitted. Two officers corroborated Officer Tuter's testimony that petitioner attacked him. In addition, while petitioner testified that Officer Tuter tried to strangle him, he had no injuries on his neck. Petitioner did not tell Nurse Cunningham that Officer Tuter had tried to strangle him. Petitioner's testimony that he reached under a table and happened to find a weapon is also not particularly believable. In addition, petitioner's statements to Wayne Irey and Officer Cueller after the incident clearly suggest that petitioner initiated the incident rather than was the victim.

After conducting an AEDPA review, the court finds that the petition should be denied.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

\\\\\

---

[1] The dry firing incident had little to do with violence and much to do with poor judgment. This evidence would not have aided the jury on the questions before them, and could have been misconstrued.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: 09/03/09

/s/ Gregory G. Hollows
_____
UNITED STATES MAGISTRATE JUDGE

play849.157